[No. A122972. First Dist., Div. Two. Dec. 2, 2009.]

SCHELLINGER BROTHERS, Plaintiff and Appellant, v.
CITY OF SEBASTOPOL, Defendant and Respondent.

COUNSEL

Bingham McCutchen, Geoffrey L. Robinson, Marie A. Cooper and Sean R. Marciniak for Plaintiff and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Julia L. Bond, Edward Grutzmacher; McLaughlin & Hendrickson and Larry McLaughlin for Defendant and Respondent.

OPINION

RICHMAN, J.—It is probably a truism that since adoption of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.[1]; CEQA) in 1970, every developer has at some point before construction starts ground his teeth or clenched her fists in frustration while enduring the often lengthy process leading to certification of an environmental impact report (EIR) for the proposed project. This appeal shows that frustration is not enough to justify premature judicial action that would short-circuit the decisionmaking process intended by CEQA.

In *Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215 [86 Cal.Rptr.2d 209] (*Sunset Drive*), the Court of Appeal held that a cause of action could be alleged to warrant issuance of a writ of *traditional* mandate under Code of Civil Procedure section 1085 compelling action by a city council that was refusing to make a decision on whether to certify an EIR. The developer here has seized upon *Sunset Drive* to support the extraordinary

---

[1] Statutory references are to the Public Resources Code unless otherwise indicated.

proposition—apparently advanced in earnest for the first time since CEQA was enacted—that a court is authorized to issue a writ of *administrative* mandamus to compel a city council to certify a proposed EIR, even though the council had decided that the pending draft EIR required recirculation to address new issues.

Certain that the *Sunset Drive* court never imagined that such a construction would be placed on its opinion, we reject that construction, and thus reject the developer's contention that the one-year time limit for certifying an EIR established by section 21151.5 of CEQA constitutes an ironclad, one-size-fits-all rule that permits no exception. We reach the same conclusion concerning the impact of Government Code section 65589.5: it too cannot be used to halt the decisionmaking process specified by CEQA that is still ongoing. Finally, we conclude that the developer's active participation in that process for more than three years—which included numerous changes in the size and composition of the project—after the date it now claims the city lost its discretionary jurisdiction amounts to laches, an accepted ground for relaxing the directory deadline of section 21151.5.

In light of these conclusions, we affirm the trial court's decision not to interject itself into the still ongoing process of preparing an EIR.

## BACKGROUND

The record before us includes 52 volumes of an administrative process that is not yet over. The parties agree that our review is de novo. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).) Fortunately, our resolution of the issues presented by this appeal will require only the briefest references to that record.

At issue here is the attempt of plaintiff and appellant Schellinger Brothers (Schellinger) to develop half of a site of approximately 20 acres in an area known as Laguna Vista within the limits of defendant City of Sebastopol (City). Schellinger, which is a partnership, does not own the property, but has an option to buy it from the current owner, Scott Schellinger, one of the partners.

Originally, in January 2001, Schellinger submitted an application to construct a project with 182 units of single-residence housing along with a

neighborhood commercial center of 16,300 square feet. The City began preparation of an EIR for the project in this form.[2]

The draft EIR was released for public comment in March 2002. Between April (when Schellinger formally resubmitted its application) and June of 2002, when the draft EIR was completed, Schellinger was continually making changes in the project. By June, when the first public hearing was conducted by the City's planning commission, the project was reduced to 177 units and the size of the commercial office center had been reduced.[3] After two public hearings, the planning commission accepted the draft EIR, with modifications.

In August, as the city council was about to consider the draft EIR as approved by the planning commission, Schellinger again retinkered the project, dropping the number of units to 172, as well as making other changes. After two public hearings, and while the council was considering the matter, Schellinger decided to resubmit its project proposal.

Schellinger submitted its new proposal in May 2003. It sought approval of a project reconfigured with 145 units and no commercial center. The City deemed Schellinger's application complete on June 23, 2003.

Thereafter, it became clear that the project implicated the City's open space ordinance, which would ordinarily require an analysis of the project separate from the EIR. However, with no objection from Schellinger, the City council decided to fold the open space analysis into the EIR. The City also decided to recirculate the draft EIR.

In September 2003, the City engaged a firm to prepare the open space analysis and the draft EIR for recirculation. But it was not until November of that year that Schellinger could arrange for that firm to have access to the project site.

---

[2] Not relevant here, except as it may explain the depth of Schellinger's commitment and its frustration with the City, is the period prior to 2001, which Schellinger described as follows in its complaint: "The Laguna Vista project has been before the City . . . in various forms for almost ten years, starting in 1997, when a preliminary review application for 200 units of senior housing and commercial uses was submitted. A similar application was submitted in 1999. In 2001, Schellinger Brothers submitted another application to develop an age-restricted community on the project site, consisting of approximately 120 senior housing units with a commercial component. The City advised Schellinger Brothers not to pursue a senior housing project."

[3] In its petition Schellinger alleged that by the time the proposal was taken up by the planning commission, the project had already been reviewed by the following "City boards and commissions": (1) the Business Outreach Committee; (2) the Street Smart Sebastopol Citizens Committee; (3) the Design Review Board; and (4) the Laguna Implementation Committee.

The recirculated draft EIR was released for public comment in August 2004. Opposition to the project—which was considerable, as it had been from the beginning—caused the City to propound a large number of requests to Schellinger for additional information. This apparently continued through October 2005.

The recirculated draft EIR was again considered by the planning commission in October and November 2005,[4] which recommended conditional approval of the recirculated draft EIR. The City Council took up the matter on December 6; the persistent opposition to the project was still vocal, and, at Schellinger's request, the matter was continued to January 2006. In February 2006, the council gave Schellinger the opportunity to submit a comprehensive response to questions and comments from both the council and the public about the project.

In May 2006, matters were approaching the point where the city council had scheduled a vote on the recirculated draft EIR. Apparently in response to the public opposition,[5] Schellinger again modified the proposal by reducing

---

[4] During this period, there were several extraneous developments that deserve brief mention.

First, the proposed project evoked a 2003 lawsuit by a public interest group dealing with an alleged violation of the City's open space ordinance. This litigation was apparently dismissed in October 2005.

The second development partakes of the bizarre. As Schellinger states it in its opening brief: "In April 2005, while review of the Recirculated Draft EIR was still ongoing, project opponents entered the . . . property and claimed that they had found Sebastopol Meadowfoam, an endangered plant species. The State Department of Fish and Game launched an investigation and conducted site visits in April and May of 2005. The investigation concluded that the Meadowfoam had been transplanted artificially, which triggered a criminal investigation. The Department then advised the City that the illegal transportation of nonnative Meadowfoam on to the site 'should not affect the environmental review process.' " The City, while not accepting that it may have been "opponents" of the project that were responsible for this "illegal transportation," does not disagree with the essentials of the narrative provided by Schellinger. Again, there is no conclusion to the criminal investigation, which was still ongoing when this litigation commenced. There is nothing in the record which suggests that this investigation in any way impeded or had any substantive impact on the administrative proceedings. Earlier, in September 2004, the possibility of an endangered species of bird on the site was raised before the city Planning Commission, which was advised that the birds might return to the site for future nesting. There was also a question—subsequently answered in the negative—about whether a species of salamander inhabited the site.

Finally, there was a lingering question as to whether part of the site was also subject to federal jurisdiction. It was not until 2008 that the question was conclusively answered in the negative. (See *Northern California River Watch v. Wilcox* (N.D.Cal. 2008) 547 F.Supp.2d 1071 [summary judgment granted Schellinger and Department of Fish and Game employees on ground of no federal jurisdiction under federal Clean Water Act].)

[5] A large portion of the administrative record (vols. 17–36, pp. 4166–8518) is devoted to "correspondence" generated by the project. Much of it is the sort of routine, behind-the-scenes notes, letters, and emails common among officials, attorneys, and consultants. However, much of it is from the public, and was overwhelmingly hostile to the project.

the number of units to 125. However, before an actual vote, the City and Schellinger agreed to undergo a mediation of the project controversy.

Almost a year passed before another revised proposal, this one based on the mediation,[6] was set to go to the city council. The number of units remained at 125 but the commercial space component was revived, although the square footage was now fixed at 2,335. However, majority support on the city council could not be mustered for the mediated project. Schellinger demanded that "the City comply with its legal duty to approve the 145-unit Laguna Vista Project" as proposed in Schellinger's May 2003 application. The City scheduled a council meeting for June 5, 2007, to consider approving the recirculated draft EIR and the project in its latest form.[7] At this point the city council decided that the draft EIR should again be recirculated for further public comment and additional analysis on certain environmental issues.

For Schellinger, this was the final straw. Schellinger refused to pay for what the City termed "further processing," whereupon the City "halted the administrative proceeding."[8] Schellinger's next move was to commence this litigation.

On August 31, 2007, Schellinger filed a complaint with seven causes of action. The only ones relevant here are the first, fourth, and fifth causes of action, which were titled "Violation of Anti-NIMBY statute" (Gov. Code, § 65589.5),[9] "Breach of Contract Regarding Processing Costs," and "Breach of Mediation Agreement," respectively.

Government Code section 65589.5 states the policy of the state that local government "shall not disapprove a housing development project . . . for very

---

[6] Both Schellinger and the City refer to this proposal as "the mediated project" in their briefs. The mediation was conducted by a retired superior court judge among Schellinger, two members of the city council, a private group calling itself the Laguna Preservation Council, and the representatives of owners and residents of a nearby mobilehome park.

[7] Special counsel for the City advised recirculation because "The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded."

[8] The final administrative action shown by the record occurred on July 17, 2007, when the city council ordered preparation of a recirculated draft EIR devoted to three issues: (1) "Additional analysis . . . regarding adequacy of water supply for the proposed project"; (2) "Additional analysis . . . regarding the potential effects of the project on the endangered plant species Sebastopol Meadowfoam"; and (3) "a reasonable range of alternatives to the Project including: [¶] An alternative that would reduce or eliminate the Project's significant impact on wetlands on-site and that could feasibly attain Project objectives. [¶] An alternative that avoids wetlands on-site and that could feasibly attain Project objectives. [¶] Identification of the environmentally superior alternative under CEQA."

[9] NIMBY is the acronym for Not-In-My-Back-Yard. Government Code section 65589.5 has never been designated by the Legislature as the "Anti NIMBY" law, the title Schellinger uses,

low, low-, or moderate-income households, . . . or condition approval in a manner that renders the project infeasible . . . ." (*Id.*, subd. (d); see *id.*, subd. (b).) Because its latest proposal for the project "proposes 20% affordable housing," Schellinger alleged that "The City's arbitrary and capricious actions in processing, or purporting to process the Laguna Vista project [application], and its recent decision to continue in the same path by imposing yet another round of inordinate delay, has effectively imposed infeasible conditions."

Schellinger's fourth cause of action alleged an implied-in-fact agreement between it and the City "that Schellinger . . . would pay or reimburse the City for the costs of processing the Laguna Vista project [application], and the City would in turn process the project [application] reasonably, competently, and in accordance with law." While Schellinger "performed all its obligations under that contract by making all payments in a timely manner," the City breached it, in that the City "has processed or purported to process the Laguna Vista project [application] unreasonably, in a manner that is arbitrary and capricious, in a manner that unreasonably and without rational cause delayed and hindered the Laguna Vista project." Schellinger alleged that it was thus entitled to damages "including processing costs in excess of those reasonably necessary for lawful, reasonable processing of the Laguna Vista project [application] within the time frame allowed by law, and damages associated with the unlawful and unreasonable delays resulting from the failure to process competently."

Finally, as to the mediation, Schellinger alleged in its fifth cause of action that the agreement to mediate was a contract, as shown by "written communications between the parties . . . , oral statements made or acquiesced in . . . , and conduct of the parties in participating and continuing to participate in the mediation process." Schellinger further alleged that the City "never intended to participate in the mediation in good faith," making the effort "a farce," thereby "defraud[ing] [Schellinger] into wasting all the time and effort it had expended" in the nearly yearlong mediation. As a consequence of the City's breach, Schellinger was "entitled to such damages as will make it whole."

Schellinger based all of the causes of action "pursuant to Code of Civil Procedure section 1094.5." In addition to damages and attorney fees, Schellinger prayed for "all remedies under Government Code section

---

nor have we found any reported decision using it. One federal district court incorrectly located section 65589.5 within the Permit Streamlining Act (which is found at Gov. Code, §§ 65920–65964). (*North Pacifica, LLC v. City of Pacifica* (N.D.Cal. 2002) 234 F.Supp.2d 1053.)

Only since 2006 has section 65589.5 had an official name, namely, the Housing Accountability Act. (Gov. Code, § 65589.5, subd. (*o*), added by Stats. 2006, ch. 888, § 5.)

65589.5, including a peremptory writ setting aside all City decisions other than approval of the project," "a peremptory writ directing the City to certify the EIR," and "a peremptory writ . . . precluding the City from taking actions that preclude or hinder its compliance" with "all applicable laws, including the Anti-NIMBY statute . . . [and] CEQA (including its one-year deadline)."[10]

The City interposed a general demurrer to these causes of action. The City claimed that Schellinger had no cause of action under Government Code section 65589.5 because: (1) "no decision has been made by the City on the Project"; (2) "section 65589.5 does not recognize a cause of action for 'effectively imposed' conditions"; and (3) Schellinger "failed to exhaust its administrative remedies." The City further argued that Schellinger had failed to allege facts sufficient to demonstrate either the existence or actionable breach of any implied-in-fact contract.

The trial court sustained the City's demurrer without granting leave to amend.[11] However, for some reason not explained by the record, the demurrers were not treated as dispositive. With the substantial administrative record now lodged, the parties submitted Schellinger's "writ claims" for decision. After hearing argument, the court made it clear why it was powerless to intervene:

"The petition appears to present two principal issues. First, does the failure of respondent to certify an EIR within one year require respondent now to certify an EIR and secondly, can respondent be required to certify an EIR they contend is insufficient.

"As to the first issue, [section] 21151.5(a)(1) states that each local agency shall establish time limits for completing and certifying EIRs not exceeding one year and subsection (a)(4) allows for reasonable extensions. These time

---

[10] Schellinger's second cause of action was for "Violation of CEQA's One-Year Deadline." Schellinger alleged that "pursuant to Sunset Drive[, supra,] 73 Cal.App.4th 215," the City has a mandatory statutory duty under section 21151.5 "to complete and certify a legally adequate EIR within one year of the date a development application is deemed complete." "The City's refusal to act to timely complete the EIR, and its arbitrary and malicious actions, have deprived Schellinger Brothers of its federal constitutional rights to due process and equal protection," thereby entitling Schellinger to damages under the Civil Rights Act of 1871 (42 U.S.C. § 1983.) These allegations were incorporated by reference into Schellinger's fourth and fifth causes of action.

[11] At the same time, the court denied the City's special motion under Code of Civil Procedure section 425.16 to strike Schellinger's complaint. We have telescoped narrating the actual proceedings in the trial court, which were considerably less simplified than portrayed here. Schellinger filed an amended complaint that differed from the original only in a single immaterial particular concerning the fourth cause of action. This necessitated a second demurrer from the City directed only to that cause of action, a demurrer subsequently abandoned.

limits are 'directory' not mandatory and there is no specification for the result of failing to comply. Therefore, the court finds for the respondent on this issue.

"As to the second issue, Guideline 15088.5(a)[12] requires an agency to recirculate and EIR when significant new information is added after public notice for public review. Respondent determined that the EIR required recirculation. This court does not have the authority to review the appropriateness of this decision.

"While a review of the time line of the proposed development certainly explains and justifies the frustration of the developer to obtain a final determination of the adequacy of the EIR from the city, a review of the EIR Guidelines and relevant opinions do not provide authority for the court to require a public agency to conclude their review as long as the agency continues the reviewing process. *Sunset Drive*[, *supra*,] 73 Cal.App.4th 215 . . . provides authority for a court to order an agency to complete the review of an EIR if it refuses to do so. Here, however, respondent is continuing its review of the EIR. This court has no authority to order respondent to speed up the process and cannot examine the reason motivating their exceedingly slow review."

Schellinger perfected this timely appeal from the judgment of dismissal entered in due course.

## DISCUSSION

The three argument headings in Schellinger's opening brief are: (1) "A Writ Should Issue Directing Certification of an Adequate EIR"; (2) "A Writ Should Issue Directing the City to Take Final Action on the Project Approvals Contemporaneously With Certification of an Adequate EIR"; and (3) "Schellinger Brothers Is Entitled to Its Day in Court on Its Complaint for Damages." Behind these rather bland phrasings are arguments which can only be appreciated with an understanding of the nuts and bolts process from which a final EIR emerges from the CEQA process.

---

[12] The guidelines mentioned by the court are the regulations promulgated by the Secretary of the Natural Resources Agency found in title 14 of the California Code of Regulations beginning at section 15000. Subsequent references to "CEQA Guidelines" will be understood as referring to these regulations. These guidelines are binding upon all state and local agencies in applying CEQA. (CEQA Guidelines, § 15000.) In addition, courts accord the guidelines great weight " 'except where they are clearly unauthorized or erroneous.' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163, fn. 7 [77 Cal.Rptr.3d 578, 184 P.3d 709].)

## The Role and Preparation of the EIR

CEQA requires public agencies to "prepare, or cause to be prepared by contract, and certify the completion of" an EIR, "on any project which they propose to carry out or approve that may have a significant effect on the environment." (§ 21100, subd. (a); see *id.*, § 21151, subd. (a).)

Beginning in 1973, the courts of California have described the EIR as the heart of CEQA (*County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377]; accord, *In re Bay-Delta etc., supra,* 43 Cal.4th 1143, 1162; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502]; *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]), a characterization subsequently put into the CEQA guidelines. (CEQA Guidelines, § 15003, subd. (a).) The EIR is statutorily described as "a detailed statement," "an informational document which . . . shall be considered by every public agency prior to its approval or disapproval of a project." (§ 21061.) Its purpose "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (*Ibid.*)

CEQA directs that an EIR ordinarily must be prepared by any local agency for "any project . . . which may have a significant effect on the environment." (§ 21151, subd. (a).) "The environmental impact report shall include a detailed statement setting forth all of the following: [¶] (1) All significant effects on the environment of the proposed project. [¶] (2) . . . : [¶] (A) Any significant effect on the environment that cannot be avoided if the project is implemented. [¶] (B) Any significant effect on the environment that would be irreversible if the project is implemented. [¶] (3) Mitigation measures proposed to minimize significant effects on the environment . . . . [¶] (4) Alternatives to the proposed project." (§ 21100, subd. (b).)

During the process of preparing the EIR, the local agency drafting the EIR is directed to "consult with, and obtain comments from, . . . any public agency that has jurisdiction by law with respect to the project." (§ 21153, subd. (a).) When the draft EIR is completed, the public and other agencies that are interested in the project commonly have between 30 and 60 days to comment. (§ 21091; CEQA Guidelines, §§ 15085–15087.) "Public hearings are encouraged, but not required as an element of the CEQA process." (CEQA Guidelines, § 15087, subd. (i).) "[A]ny person . . . [may] [submit] information or other comments to the public agency responsible for preparing" a draft or final EIR. (§ 21082.1, subd. (b); see § 21003.1, subd. (a).)

 The courts have also characterized the EIR as "an environmental 'alarm bell' whose purpose is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." (*County of Inyo v. Yorty, supra,* 32 Cal.App.3d 795, 810; accord, *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1229 [32 Cal.Rptr.2d 19, 876 P.2d 505]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278]; see *Vineyard, supra,* 40 Cal.4th 412, 441.) An EIR is "a document of accountability" that is "intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' " (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 392, quoting *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66]; see CEQA Guidelines, § 15003, subd. (d).) Public feedback, particularly when it is negative, is "an essential part of the CEQA process." (CEQA Guidelines, § 15201; see *id.,* § 15003(e); *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 392 ["the public, being duly informed, can respond . . . to action with which it disagrees."].) Public comments are deemed sufficiently important to warrant written response. (CEQA Guidelines, § 15088, subd. (a); cf. § 21092.5, subd. (a) [comment from another public agency to receive written response].)

Negative feedback, whether from the public or from other public agencies, is to be considered to determine whether it requires alteration of the draft EIR. (§ 21091, subd. (d).) If the feedback is "new" and "significant," the draft EIR may be modified, at which the period of notice and comment begins again. (See § 21092.1; CEQA Guidelines, § 15088, subd. (a); *Vineyard, supra,* 40 Cal.4th 412, 447; *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th 1112, 1124–1125.) This process of resubmission is commonly called recirculation, the process Schellinger found intolerably prolonged.

 The final EIR, the document certified by the governmental entity approving a private project, must include comments, official responses, and any other information added by the preparing agency. (CEQA Guidelines, § 15132.) By certifying a final EIR, the governmental entity has determined the EIR was "completed in compliance with CEQA." (CEQA Guidelines, § 15090, subd. (a)(1).) It is only after the final EIR is certified that the project can be approved. (CEQA Guidelines, § 15090, subd. (a).) If significant adverse environmental impacts of the project are identified in the final EIR, the project cannot be approved unless "[c]hanges or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment" or "specific overriding economic, legal, social, technological, or other considerations" or "other considerations . . . make infeasible the mitigation measures . . ." identified in the EIR.

(§ 21081, subds. (a)(1), (3), (b); see CEQA Guidelines, §§ 15092–15093; §§ 21002, 21002.1, subds. (b)–(c).)

■ This is the general outline of how CEQA envisions preparation and certification of an EIR. There is some flex in the joints. Our Supreme Court has emphasized "the practical over the formal" in deciding the timing of CEQA review. (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 135 [84 Cal.Rptr.3d 614, 194 P.3d 344].) That review is not required "before a definite project has been formulated and proposed to the agency." (*Id.*, at p. 139.) Further flexibility is allowed when a proposed project generates "a staged EIR (Cal. Code Regs., tit. 14, § 15167) or some other appropriate form of tiering [citations] may be used to postpone to a later planning stage the evaluation of those project details that are not reasonably foreseeable when the agency first approves the project."[13] (45 Cal.4th at p. 139.)

### Section 21151.5 Does Not Support Schellinger's Contention That an EIR Must Be Certified Within One Year After It Is Deemed Submitted

The wellspring of Schellinger's position is section 21151.5, which provides that for projects undergoing CEQA review "each local agency shall establish, by ordinance or resolution, time limits that do not exceed the following: [¶] One year for completing and certifying environmental impact reports,"[14] that period to commence "from the date on which an application requesting approval of the project is received and accepted as complete by the local agency." (§ 21151.5, subd. (a)(1)(A), (2).)

■ The nub of Schellinger's position is stated in its brief as follows: "Here, the City has delayed and delayed, and no end is in sight. Schellinger Brothers' application was deemed complete by the City on June 23, 2003, and the deadline for completion of the EIR was therefore June 23, 2004. (Pub. Resources Code, § 21151.5.) The City's failure to certify an EIR within a year mandates issuance of a writ." This argument assumes that failure to certify a final EIR within the one-year period provided for in section 21151.5

---

[13] "Tiering is 'the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . .' (Cal. Code Regs., tit. 14, § 15385.) Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.' (Pub. Resources Code, § 21093, subd. (a); see also Cal. Code Regs., tit. 14, § 15385, subd. (b).)" (*In re Bay-Delta etc., supra*, 43 Cal.4th 1143, 1170; see also § 21094.)

[14] Schellinger states that the City "has incorporated the requirements of section 21151.5 into its Municipal Code. Sebastopol Mun. Code, § 16.24.040(b) ('The City shall comply with the time periods referred to in Section 21151.5 of the Public Resources Code.'), § 16.28.050(b) (same)." The City does not dispute this statement.

is akin to a mandatory, nonwaivable, jurisdictional deadline within which the local agency must act on penalty of power to act beyond that period. This argument further assumes that if, at the end of one year after a project application was submitted, no definitive action has been taken, the pending application will be deemed approved by operation of law. Although it goes unmentioned in Schellinger's brief, all precedent is to the contrary.

■ "CEQA contains no 'deemed approval' provision for cases where an agency fails to comply with the time requirements for environmental determinations. [Citations.] 'CEQA itself contains no automatic approval provisions and its time limits are directory rather than mandatory.' " (*Eller Media Co. v. City of Los Angeles* (2001) 87 Cal.App.4th 1217, 1221 [105 Cal.Rptr.2d 262].) This is not an isolated, or aberrational, utterance, but an exemplar of an unbroken line of authority. (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1415 [22 Cal.Rptr.3d 393]; *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1440–1441 [91 Cal.Rptr.2d 322]; *Land Waste Management v. Contra Costa County Bd. of Supervisors* (1990) 222 Cal.App.3d 950, 962 [271 Cal.Rptr. 909]; cf. *Meridian Ocean Systems, Inc. v. State Lands Com.* (1990) 222 Cal.App.3d 153, 168 [271 Cal.Rptr. 445] [duty imposed by § 21080.2 to decide within 30 days whether EIR or negative declaration required is not mandatory].)

These same authorities also hold that the provisions of the Permit Streamlining Act (see fn. 9, *ante*) do not change this conclusion because it, like CEQA, has no "deemed approved" provision for EIR's.[15] As first held by Division Three of this district: "[T]he Permit Streamlining Act, which was enacted after CEQA, did not add any automatic approval provision for EIRs, and did not mention EIR certification in the automatic approval provisions which it did set forth. The Legislature must be presumed to have been aware of the CEQA time limits at the time it enacted the Permit Streamlining Act, indicating its tacit intent to leave the law as it stands. [Citations.] In view of the Legislature's failure to enact such a drastic provision, we now decline to read it into CEQA ourselves." (*Land Waste Management v. County of Contra*

---

[15] The Permit Streamlining Act does have a provision specifying that a "development project" will be "deemed approved" if the "responsible agency fails to act to approve or disapprove" the project, but only if notice of that consequence is given to the public. (Gov. Code, § 65956, subd. (b).) Schellinger never provided such notice. A concise history of the Permit Streamlining Act, and its "deemed approved" provision, may be found in *Mahon v. County of San Mateo* (2006) 139 Cal.App.4th 812 [43 Cal.Rptr.3d 235].

It is more than a little puzzling to see Schellinger in its brief cite the Subdivision Map Act (Gov. Code, §§ 66410–66499.58) as an example of a statutory scheme that "requires prompt decision-making" because that scheme has a provision expressly reciting the instances where local failure to act within a specified period has the consequence of the pending application being deemed approved by operation of law (*id.*, § 66452.4).

*Costa, supra,* 222 Cal.App.3d 950, 962; accord, *Eller Media Co. v. City of Los Angeles, supra,* 87 Cal.App.4th 1217, 1219–1221; *Riverwatch v. County of San Diego, supra,* 76 Cal.App.4th 1428, 1441; see *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 257–258 & fn. 3 [80 Cal.Rptr.3d 876] [rezoning application not deemed approved by Permit Streamlining Act]; *Landi v. County of Monterey* (1983) 139 Cal.App.3d 934, 935–937 [189 Cal.Rptr. 55] [same].)

Moreover even by its own terms section 21151.1 does not fix the one-year period in cement. It expressly recognizes that the local ordinances and resolutions it requires "may establish different time limits for different types or classes of projects," as well as "different types" of EIR's. (§ 21151.5, subd. (a)(2).) The local legislation may also "provide for a reasonable extension of the time period in the event that compelling circumstances justify additional time and the project applicant consents thereto." (*Id.,* subd. (a)(4).)[16] The period for completing and certifying a final EIR can also be suspended for the period of an unreasonable delay by the applicant "in meeting requests by the . . . agency necessary for the preparation of . . . an EIR." (CEQA Guidelines, § 15109.)

## The Housing Accountability Act (Gov. Code, § 65589.5) Likewise Furnishes No Support to Schellinger's Position

The above reasoning is equally applicable to the Housing Accountability Act. The stated purpose of this measure is to reduce the scope for local government to "reject or make infeasible housing developments . . . without a thorough analysis of the economic, social, and environmental effects," and unless the local agency has adopted written specified findings. (Gov. Code, § 65589.5, subd. (b); see *id.,* subd. (j).) However, unlike CEQA, the Housing Accountability Act has an enforcement mechanism.

"The applicant or any person who would be eligible to apply for residency in the development . . . may bring an action to enforce this section. If in any action brought to enforce the provisions of this section, a court finds that the local agency disapproved a project or conditioned its approval in a manner rendering it infeasible . . . without making the findings required by this section or without making sufficient findings supported by substantial evidence, the court shall issue an order or judgment compelling compliance with this section within 60 days." (Gov. Code, § 65589.5, subd. (k).) The court shall award reasonable attorney fees and costs to the plaintiff, and may fine the local agency if it is found to have acted in bad faith. (*Id.,* subds., (k), (*l*).)

---

[16] The City does not identify any such provisions in its municipal code. Our research of that code uncovered several provisions that appear to permit extensions by mutual consent of the project applicant and the City. (See Sebastopol Mun. Code, §§ 16.04.110, 16.28.080, 16.28.100.)

■ Like CEQA, the enforcement is to be sought in administrative mandamus "pursuant to Section 1094.5 of the Code of Civil Procedure." (Gov. Code, § 65589.5, subd. (m).)[17] However, just like the Permit Streamlining Act, the Housing Accountability Act has no provision automatically approving EIR's if local action is not completed within a specified period. It too was enacted after CEQA (Stats. 1982, ch. 1438, § 2, p. 5484), but there is no indication the Legislature meant to modify or accelerate CEQA's procedures. (See *Riverwatch v. County of San Diego, supra,* 76 Cal.App.4th 1428, 1441; *Land Waste Management v. County of Contra Costa, supra,* 222 Cal.App.3d 950, 962.) Again, the indications are to the contrary. The Housing Accountability Act expressly states that "Nothing in this section shall be construed . . . to relieve the local agency from making one or more of the findings required pursuant to Section 21081[18] . . . or otherwise complying with the California Environmental Quality Act . . . ." (Gov. Code, § 65589.5, subd. (e).) ■ But it specifically pegs its applicability to the approval, denial or conditional approval of a "housing development project" (*id.,* subds. (d)(3), (5)(A), (h)(5)(A), (i), (k), (*l*)), which, as previously noted, can occur *only after the EIR is certified.* (CEQA Guidelines, § 15090, subd. (a).) That obviously has not occurred here.

■ In light of the foregoing, we conclude that neither of the statutes cited by Schellinger imposes a self-executing deadline within which an EIR must be certified. Neither section 21151.5 of CEQA, nor Government Code section 65589.5, the Housing Accountability Act, constitute a categorical or jurisdictional bar to preparation and certification of an EIR taking more than 365 days after the project's application is deemed complete. We now consider whether *Sunset Drive* dictates modification of this conclusion.

### *Sunset Drive Corp. v. City of Redlands*

Because it figures so prominently in Schellinger's arguments, it is appropriate to consider the *Sunset Drive* opinion in detail.

---

[17] The comparable provisions in CEQA are sections 21168 and 21168.5. "Judicial review of agency action under CEQA is governed by sections 21168 and 21168.5 . . . . [¶] . . . [T]he Legislature intends sections 21168 and 21168.5 to apply to *all* proceedings under CEQA . . . ." (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d 68, 74, fn. 3, italics added.)

[18] Section 21081 is the provision of CEQA directing that a project shall not be approved unless the responsible agency "makes one or more of the following findings with respect to each significant effect [on the environment]: [¶] (1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment. [¶] (2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency. [¶] (3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report." (§ 21081, subd. (a).)

The Sunset Drive Corporation wanted to develop property it owned within the City of Redlands. Its application to do so was deemed complete in November 1992. The first draft of the EIR was finished by January 1994 but was extensively revised in response to critical comments. The revised draft EIR was ready in March 1995. More criticism led to a third version of the draft EIR that was submitted in August 1995. (*Sunset Drive, supra,* 73 Cal.App.4th 215, 219.)

In the complaint it filed in May 1996, Sunset alleged that "Since the submission of the third proposed draft EIR, Sunset has repeatedly demanded of Redlands that it either approve that proposed draft or advise Sunset of the manner in which Redlands determined the draft to be inadequate. Redlands has done neither. In addition, Sunset has complied with all requests of Redlands for further information and for funds with which to complete, review, and certify an EIR. Nevertheless, Redlands has refused to take any action toward doing so. [¶¶] Redlands has a ministerial duty to complete and certify a final EIR, and Sunset has no administrative remedy available to it to compel the performance of that duty." (*Sunset Drive, supra,* 73 Cal.App.4th 215, 219–220.) Sunset alleged causes of action for issuance of a writ of traditional mandamus, and for money damages. The trial court dismissed the action after sustaining Redlands's demurrers without leave to amend. (*Id.,* at p. 218.)

The Court of Appeal reversed. Assuming that "[f]rom the facts alleged . . . Redlands has violated its duties" under section 21151.5 to "complete [the EIR] process within one year of its acceptance" of Sunset's application, the court turned to the issue of "whether Sunset has any remedy for that breach by Redlands." (*Sunset Drive, supra,* 73 Cal.App.4th 215, 220–221.) And held that traditional mandamus was available: "A refusal to exercise discretion is itself an abuse of discretion. [Citation.] Accordingly, although mandamus is not 'available to compel the exercise by a court or officer of the discretion possessed by them in a particular manner, or to reach a particular result, it does lie to command the exercise of discretion-to compel some action upon the subject involved.' [Citations.] [¶] Here, Sunset is not asking Redlands to approve the draft EIR in its current form, but only to complete a draft EIR in some form. Nor is Sunset seeking to control Redlands's decision, after the EIR is completed and certified, as to whether the project should be approved. Sunset's focus is on the timing of the completion, not on the contents of the completed document or the nature of the ultimate decision that document is intended to inform. By both state law and its own guidelines, Redlands has no discretion to refuse to complete an EIR when a project requires one. Therefore, mandamus lies to compel Redlands to complete the process of preparing and certifying the EIR for this project." (*Id.,* at p. 222.)

Next, the court concluded that the one-year deadline of section 21151.5 could be enforced by mandamus: "Statutory time limits are usually deemed to be directory [citation], but even directory time limits may be enforced by a writ of mandate compelling the agency to act [citations]. . . . [¶] Redlands has offered no authority suggesting that Public Resources Code section 21151.5 is an exception to that general rule. Accordingly, even assuming that the time limit is directory rather than mandatory, an agency which has missed that deadline may be compelled to act by a writ of mandate." (*Sunset Drive, supra,* 73 Cal.App.4th 215, 223.)

The court also concluded that the decision first rejecting the "deemed approved" argument was not controlling: "Redlands's reliance upon *Land Waste Management v. Contra Costa County Bd. of Supervisors* . . . to support its argument to the contrary is misplaced. That opinion does not address the issue of whether Public Resources Code section 21151.5 may be enforced by mandamus. Instead, it considers and rejects the contention that if that deadline is not met, the EIR must be deemed certified. [Citation.] Because Sunset makes no such contention, that case is inapposite." (*Sunset Drive, supra,* 73 Cal.App.4th 215, 223–224.)

Under the heading *"The Petition Does Not Establish That Sunset Unreasonably Delayed the Preparation of the Draft EIR,"* the *Sunset Drive* court next concluded: "Redlands also contends that the time limit of Public Resources Code section 21151.5 is unenforceable because the running of the one-year period is suspended during any period of unreasonable delay by the applicant in meeting requests by the lead agency necessary for the preparation of an EIR. (Guidelines, § 15109.) But Redlands forgets that our review is limited to the facts pleaded in the petition. While at trial Redlands may be able to establish that the speed with which Sunset responded to its requests was unreasonably slow, that fact does not appear from the face of the pleading.

"Besides, even assuming that Sunset was unreasonably dilatory to some extent when preparing the first proposed draft EIR or when revising the first and second proposed draft EIR's, with the result that the time period was tolled during those periods of delay, the facts alleged in the petition still indicate that Redlands exceeded the one-year limit. The petition alleges that Redlands did not complete its initial study until nearly seven months after the applications were deemed complete, and that over nine months passed between the submission of the third proposed draft EIR and the filing of the petition. Those two time periods alone exceed the one year permitted for the entire process to be completed. Therefore, the pleading does not establish the existence of unreasonable delay of the extent necessary to disprove the allegation that Redlands exceeded the one-year limit." (*Sunset Drive, supra,* 73 Cal.App.4th 215, 224, fn. omitted.)

In the final portion of its opinion, the *Sunset Drive* court rejected a number of arguments from Redlands as to why the petition did not state a cause of action for violation of Sunset Drive's federal constitutional rights to due process and equal protection, thereby entitling Sunset Drive to damages under the Civil Rights Act of 1871 (42 U.S.C. § 1983). The court held that the underlying basis of the pleaded claim was sound: "[A]lthough an agency does not have a duty to approve any particular proposed draft EIR, it is obligated to complete a satisfactory EIR when a project requires it. It is the failure to perform the latter duty which forms the basis for Sunset's damage claim." (*Sunset Drive, supra,* 73 Cal.App.4th 215, 225.) "[R]egardless of whether a duty is deemed to be mandatory or directory, the agency is required to perform it. When a procedural requirement is directory, and thus 'invalidation is not appropriate, other remedies—such as injunctive relief, mandamus or monetary damages—may be available to enforce compliance with the statutory provision.' [Citation.] Redlands presents no authority for the proposition that an agency may maliciously or arbitrarily refuse to perform a directory duty with impunity. In particular, it offers no authority to support its contention that it may refuse to complete an EIR for a project which requires one without incurring liability for the damages that refusal causes." (*Ibid.,* quoting *Morris v. County of Marin* (1977) 18 Cal.3d 901, 909, fn. 4 [136 Cal.Rptr. 251, 559 P.2d 606].)

### The Reasons Why We Agree With the Trial Court That Schellinger Was Not Entitled to Relief

Although Schellinger sees *Sunset Drive* as dispositive in its favor, we conclude there are three reasons why that decision cannot be regarded as controlling here.

First, as previously mentioned, Schellinger alleged in its complaint that it was proceeding under Code of Civil Procedure section 1094.5, the procedure specified in section 21168, part of CEQA. But the relief it sought was the command of the court to the City to take certain actions, namely "to certify the [draft] EIR," to "[set] aside all City decisions other than approval of the project" in a particular form, that is, "the 145-unit Laguna Vista project" that was the version of the project before the City prior to the mediation. However, and as the *Sunset Drive* court noted, it is traditional mandamus under Code of Civil Procedure section 1085 that issues to compel the performance of a ministerial duty, and even then it will not compel the exercise of such a duty in a particular fashion. (*Sunset Drive, supra,* 73 Cal.App.4th 215, 222, citing *Hollman v. Warren* (1948) 32 Cal.2d 351, 355 [196 P.2d 562]; see 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 92, p. 981, and authorities cited.)

 In addition, a provision of CEQA expressly prohibits granting the relief Schellinger seeks. Schellinger invokes that part of the statute stating that "If a court finds . . . that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes . . . : [¶] . . . A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part" or "[a] mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division." (§ 21168.9, subd. (a)(1), (3).) However, Schellinger fails to appreciate that the corrective power thus granted is distinctly limited—and essentially negative. This is confirmed by other language in the statute: "Nothing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way." (*Id.*, subd. (c).) A public agency may be directed to comply with CEQA, or to exercise its discretion on a particular subject, but a court will not order that discretion to be exercised in a particular fashion, or to produce a particular result. (See 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2009) § 23.125, pp. 1270, 1272–1273, and authorities discussed.)

Thus, even according to *Sunset Drive* and section 21168.9—the very authorities upon which it relies—Schellinger was not entitled to the relief it sought. Schellinger is unable to muster a single authority in its brief that what it wants is available in administrative mandamus.[19]

---

[19] In its briefs Schellinger denies that it wants a judicial order directing the City to certify an EIR " 'in its current form, or in any particular form' " or "a previously drafted EIR," a denial repeated at oral argument. But the allegations of its petition belie this denial. Schellinger alleged that "the final EIR" published in September 2005 for the 145-unit project "was adequate and complied with all requirements of the CEQA statutes, guidelines, and caselaw pertaining to the contents of that document." Schellinger further alleged that on March 17, 2006, it "submitted comprehensive written responses to every detail raised by commentators and decisionmakers regarding this project," and "showed that the environmental analyses the City had already undertaken were reasonable, comprehensive and legally adequate. In several instances, and in an attempt to make the decision to approve the project as easy as possible for the City, Schellinger Brothers included information that exceeded any required by law, and which buttressed and confirmed, through alternative or additional studies, the conclusions of the EIR." Again, "The EIR the City prepared is legally adequate for the Laguna Vista project, both by itself and in light of the additional information provided by Schellinger Brothers on March 17, 2006. The EIR is adequate in all circumstances . . . . The City is, however, continuing to refuse to certify the EIR. [¶] Accordingly, a writ should issue directing the City to certify the EIR, and/or to take such steps regarding the additional information provided by Schellinger Brothers, in timely fashion, as are reasonably necessary to ensure the City will certify the EIR." And again, in the prayer, Schellinger stated it sought "a peremptory writ directing the City to certify the EIR," as well as "a peremptory writ setting aside all City decisions other than approval of . . . the 145-unit Laguna Vista project."

The only fair reading of these allegations is that Schellinger considers the EIR published in September 2005, together with Schellinger's subsequent responses and additional information, a legally adequate EIR for the 145-unit proposal. The allegation about "setting aside all City

Second, it is important to remember that *Sunset Drive* dealt only with the sufficiency of a pleading, whose factual allegations had to be accepted as true. (See *Sunset Drive, supra*, 73 Cal.App.4th 215, 218–219.) The most fundamental of those allegations were that "Sunset has repeatedly demanded of Redlands that it either approve [the submitted] proposed draft [EIR] or advise Sunset of the manner in which Redlands determined the draft to be inadequate. Redlands has done neither. In addition, Sunset has complied with all requests of Redlands for further information and for funds with which to complete, review, and certify an EIR. Nevertheless, Redlands *has refused to take any action toward doing so*." (*Id.*, at pp. 219–220, italics added.) Here, the situation is not that the local agency has refused to exercise its discretion, but that it has in effect never stopped exercising that discretion, and, if anything, has over-exercised it.

Third, while *Sunset Drive* accepted the focused promptitude of the project applicant as a given, the situation here is entirely different. While delay attributable to the applicant figured as a hypothetical possibility in *Sunset Drive*, here it is a tangible reality—shown by an extensive record—that Schellinger was hardly a passive participant in the lengthy administrative proceedings. Whether framed in the language of waiver,[20] estoppel, laches, or forfeiture, a very good case can be made that Schellinger did not seek relief in a timely fashion. Schellinger's current view of the compulsory nature of the one-year period in section 21151.5 is not one it expressed until very long after that period had run.

■ Although the City asks that Schellinger's appeal be blocked as a matter of waiver,[21] we see the issue as one of laches. "The defense of laches requires unreasonable delay plus either acquiescence in the act about which

---

decisions other than approval of . . . the 145-unit Laguna Vista project" is clearly aimed at the city council's decision to recirculate for a second time. If that decision is voided, certification of the September 2005 EIR for the 145-unit proposal would be the only matter pending for the City to take, which is clearly tantamount to a ministerial duty to approve, not just any EIR, but that specific EIR. This is why we have not accepted Schellinger's protestations, and have characterized its goal as we have.

[20] In one of the decisions holding that section 21151.5 did not establish a mandatory timeframe, the Court of Appeal stated: "With respect to local agencies, Public Resources Code section 21151.5, subdivision (a)(4), provides in pertinent part that by ordinance or resolution the time in which to complete and certify an EIR may be extended 'in the event that compelling circumstances justify additional time and the project applicant consents thereto.' Under this provision the conduct of an applicant may in fact act as a waiver of CEQA's time requirements." (*Riverwatch v. County of San Diego, supra*, 76 Cal.App.4th 1428, 1440.) As relevant here, the City's governing ordinance states: "Except as may be limited by State law, any time limits specified by law may be extended by mutual consent . . . ." (Sebastopol Mun. Code, § 16.04.110.)

[21] "Relying on Public Resources Code section 21151.5, section 15109 of the CEQA Guidelines (Guidelines; Cal. Code Regs, tit. 14, § 15000 et seq.) provides in pertinent part: 'An unreasonable delay by an applicant in meeting requests by the lead agency necessary for the

plaintiff complains or prejudice to the defendant resulting from the delay."[22] (*Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617], fns. omitted.) The defense is available in actions for mandamus relief, whether administrative (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67–68 [99 Cal.Rptr.2d 316, 5 P.3d 874]; *Vernon Fire Fighters Assn. v. City of Vernon* (1986) 178 Cal.App.3d 710, 718–719 [223 Cal.Rptr. 871]) or traditional (*Womack v. San Francisco Community College Dist.* (2007) 147 Cal.App.4th 854, 864–865 [54 Cal.Rptr.3d 558]; *San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 605 [51 Cal.Rptr.2d 897]). Although the issue was not addressed by the trial court, we may do so in the first instance because our review of the record is de novo, and the issue is patent from the pleadings and record. (See, e.g., *Johnson v. City of Loma Linda, supra,* at pp. 67–68; *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142, 1158–1159 [98 Cal.Rptr.2d 775] and authorities cited.)[23]

It is important to note that a significant portion of the extended delay was solely attributable to Schellinger, which was repeatedly revising the scope of its proposal. The number of units in the project was constantly changing. The commercial element of the proposal at various stages contracted, disappeared entirely, and then reappeared. Although in its complaint Schellinger recites the background of its involvement going back to 1997 (see fn. 2, *ante*), it pegs the June 23, 2003 "completeness date" of its application as "start[ing] a clock running on the one-year time deadline for the City to prepare a legally adequate EIR, pursuant to . . . § 21151.5." However, in light of the constant revisions and modifications made by Schellinger, it is not entirely accurate to characterize its application as complete as of that date. Because practical realities must be acknowledged, the constantly changing scope and contents

---

preparation of a negative declaration or an EIR shall suspend the running of the time periods [for preparation of a negative declaration or an EIR].' " (*Riverwatch v. County of San Diego, supra,* 76 Cal.App.4th 1428, 1440.) The City invokes this authority as supporting its claim that Schellinger's delay in providing information continually impeded the City's processing of its application and thus "constitutes a waiver of CEQA's one-year time period."

[22] Proof of the similarity, circularity, and overlap between the criteria for waiver and laches, the decisions also state that unreasonable delay is indicative of " 'abandonment or waiver.' " (E.g., *Marriage v. Keener* (1994) 26 Cal.App.4th 186, 190 [31 Cal.Rptr.2d 511]; *City of Highland v. County of San Bernardino* (1992) 4 Cal.App.4th 1174, 1192 [6 Cal.Rptr.2d 346].)

[23] Schellinger tells us that this issue should not be reached because the City "failed to plead this defense adequately." Not so. First of all, due to the peculiar procedures employed in the trial court (see fn. 11, *ante*), matters never reached the stage where the City filed an answer, so the absence of an officially pleaded affirmative defense is not dispositive. Second, the City did raise the issue in its trial brief, arguing that "Petitioner's Own Active Participation and Delay in Processing Constitutes a Waiver of CEQA's One-Year Time Period," in which it quoted part of the passage from *Riverwatch v. County of San Diego, supra,* 76 Cal.App.4th 1428, that is quoted in footnote 21, *ante*. It is therefore especially puzzling to find that this decision goes unmentioned in both of Schellinger's briefs.

of the project meant that the City was facing a project application that may not have been "well enough defined 'to provide meaningful information for environmental assessment.' " (*Save Tara v. City of West Hollywood, supra*, 45 Cal.4th 116, 135, 139, quoting CEQA Guidelines, § 15004, subd. (b).) Put otherwise, we are addressing a situation distinctly different from *Sunset Drive*, where (at least as pleaded) the contours of the project submitted appear never to have changed. (See *Sunset Drive, supra*, 73 Cal.App.4th 215, 219–220 [summarizing allegations of Sunset Drive's petition].)

Moreover, the administrative record shows that "the one-year deadline" came and went without a word of protest from Schellinger. On June 28, 2004, a mere five days after that period supposedly expired, Schellinger was advising the City that it was working on its comments to "the latest . . . draft of the Laguna Vista EIR" so that they could be forwarded to the consultant preparing the EIR During the one-year period after its application was deemed complete, Schellinger was in regular communication with the City regarding: (1) arranging a site visit by various consultants and observers; (2) exchanging information for the EIR and getting it ready for circulation in August 2004; and (3) aspects of the pending lawsuits (see fn. 4, *ante*). The same activities continued long after June 24, 2004.

According to our review of the record, it was not until sometime in September of 2004 that the first time-related rumbling came from Schellinger's counsel in a letter to the City's planning commission; although citing section 21151.5, *Sunset Drive*, and Government Code section 65589.5, counsel did not go beyond "urg[ing] the Commission to complete its preliminary review . . . at the continued hearing on the [September 28], and to move the processing along such that the City Council can consider the project within the next few months." It appears that it was not until October 2005, protesting yet another hearing pending before either the planning commission or the design review board, that Schellinger's attorney first claimed "The City's Actions Violate CEQA's One-Year Mandate" and raised the spectre of litigation. By December of 2005, Schellinger's threat of litigation against the City seems to have become a matter of common knowledge in the community. Nevertheless, Schellinger spent almost an entire year in a voluntary effort to mediate with the City. And it was not until June of 2007, on the basis of *Sunset Drive* and Government Code section 65589.5, that Schellinger's counsel dispatched a letter with a formal "demand that the City comply with its legal duty to approve the 145-unit Laguna Vista Project, subject only to the conditions we transmitted to the City yesterday."

Thus, for almost three full years after Schellinger now insists the City had no discretionary power, Schellinger was in effect asking the City to exercise that power—and cooperating with City as it continued to exercise it. This is abundant support for a determination that Schellinger itself acted with unreasonable delay, and that it acquiesced in the City taking more than a year to certify an EIR. (*Johnson v. City of Loma Linda, supra,* 24 Cal.4th 61, 67–68; *Conti v. Board of Civil Service Commissioners, supra,* 1 Cal.3d 351, 359.)[24]

## CONCLUSION AND DISPOSITION

Like other courts, we are not insensitive to the possibility that CEQA review is subject to manipulation and elongation that may verge on abuse of the process. (E.g., *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th 1112, 1132 ["the Legislature did not intend to promote endless rounds of revision and recirculation of EIRs. . . . '[R]ules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement.' "]; *Big Rock Mesas Property Owners Assn. v. Board of Supervisors* (1977) 73 Cal.App.3d 218, 229 [139 Cal.Rptr. 445] [" 'Preparation of an EIR need not be interminably delayed . . . .' "]; cf. *California Trout, Inc. v. Superior Court* (1990) 218 Cal.App.3d 187, 203 [266 Cal.Rptr. 788] ["An administrative agency has no discretion to engage in unjustified, unreasonable delay in the implementation of statutory commands."].) Simply looking at a calendar lends a considerable force to Schellinger's position. However, as we have shown, Schellinger was not a helpless bystander on a perpetual merry-go-round, but an active participant in the CEQA process as it stretched into 2004, 2005, 2006, 2007, and 2008. Moreover, even if some of the reasons were extraneous and in no sense attributable to Schellinger (see fn. 4, *ante*), they added a dimension of complications that distinguished this proposed project from the

---

[24] Schellinger and the City devote a considerable amount of time in their briefs to issues relating the City's decision in January 2007 to recirculate the draft EIR. They disagree not so much about the merits, but about what is the correct standard of review, a matter that appears to be undecided. A local agency decision *not* to recirculate "is reviewed only for support by substantial evidence" (*Vineyard, supra,* 40 Cal.4th 412, 447), but no reported decision has discussed what is the standard of review for a converse decision. In light of our conclusion that Schellinger was not entitled to the relief it sought in mandate—city council certification of the draft EIR for the project of 145 residential units and no commercial development reflect in the application submitted by Schellinger in May 2003—there is no need to examine the validity of a decision made by the council in June 2007. Similarly, because the City has not been shown to have acted illegally, there is no occasion to address Schellinger's ancillary cause of action for damages.

run-of-the-mill development. Thus, after our de novo review, we reach the same conclusion as the trial court—whatever sympathy we may have for Schellinger's situation, it is simply not entitled to the relief it seeks.

The judgment is affirmed.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied December 28, 2009.